## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **GWENDOLYN MCCURDY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:13-cv-934-DAB** |
| | ) | |
| **STATE OF ALABAMA** | ) | |
| **DISABILITY DETERMINATION** | ) | |
| **SERVICE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

This employment discrimination case is brought by Plaintiff Gwendolyn McCurdy (hereinafter "Plaintiff") against the State of Alabama Disability Determination Service (hereinafter "Defendant"), the only remaining named defendant. The individual Defendants named in the original complaint (which was filed *pro se*), as well as Defendant State of Alabama, were dismissed pursuant to this court's order dated March 31, 2014. (Doc. 10). The First Amended Complaint is the operative pleading. (Doc. 32). While not set out in traditional counts, the Amended Complaint purports to state claims arising out of the following statutory provisions: Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 1981, by and through the remedial vehicle of 42 U.S.C. § 1983; the Age Discrimination in Employment Act (ADEA); and the Americans with Disability Act (ADA).

Before the court is Defendant's motion for summary judgment. (Doc. 56). For the reasons stated herein, that motion is **GRANTED**. Also before the court is Plaintiff's motion to strike the Affidavit of Norman Ippolito and all references to said Affidavit used to support the Defendant's Motion for Summary Judgment. (Doc. 65). Plaintiff states that "[o]n the day of said noticed deposition of Mr. Ippolito he did not appear and no formal objection to said deposition was served on Plaintiff or her

counsel prior to said date." *Id.* at ¶ 3.  Plaintiff further argues that "the submission of said affidavit after the fact without the benefit of being able to cross examine said witness amounts to surprise and is highly prejudicial to Plaintiff's ability to respond to said submission in her response to Defendant's motion for summary judgment." *Id.* at ¶ 4. However, Plaintiff did not file an objection or motion to compel the deposition of Ippolito. Moreover, to the extent that any fact in the affidavit conflicts with other evidence, the facts are construed in the light most favorable to Plaintiff as the non-moving party. Accordingly, Plaintiff's motion to strike the Affidavit of Norman Ippolito is **DENIED**.

## I.   JURISDICTION

Subject matter jurisdiction over Plaintiff's federal claims is conferred by 28 U.S.C. § 1331.  The parties do not dispute venue or personal jurisdiction, and there are adequate allegations in Plaintiff's First Amended Complaint to support both.  On October 5, 2015, the parties consented to Magistrate Judge Jurisdiction for all matters pursuant to Rule 73, Fed. R. Civ. P., and 28 U.S.C. § 636(c). (Doc. 44).

## II.   PLAINTIFF'S CLAIMS

Plaintiff brought the following claims: § 1981 claims for race-based disparate treatment in job duties, assignments, job evaluations, pay, working conditions, hiring, promotion, discipline, and "other terms and conditions of employment;" a § 1981 claim for hostile work environment; a § 1981 claim for retaliation; Title VII claims for race, sex, and national origin-based disparate treatment in job duties, assignments, job evaluations, pay, working conditions, hiring, promotion, discipline, and "other terms and conditions of employment;" a Title VII claim for hostile work environment; a Title VII claim for retaliation; an ADEA claim; and an ADA claim.

The presiding District Judge[1] dismissed the following claims:

"the Title VII claims based on sex and national origin; the Title VII and § 1981 claims for race-based discrimination as to pay, hiring, working conditions, and other terms and

---

[1] This order was entered prior to the parties consenting to Magistrate Judge Jurisdiction.

conditions of employment (as defined in the magistrate judge's recommendation); the
Title VII and § 1981 claims for hostile work environment; the Title VII and § 1981 claims
for retaliation; the ADA claim; and the ADEA claim."

(Doc. 41). Accordingly, only the following claims survive for summary judgment review:[2] Plaintiff's §

1981 claims: race discrimination in termination, job duties, assignments, job evaluations, promotion,

and discipline; and Plaintiff's Title VII claims: race-based disparate treatment in termination, job duties,

assignments, job evaluations, promotion, and discipline.

## III.    SUMMARY JUDGMENT STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is proper "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as

a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*,

229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial

responsibility of informing the court of the basis for its motion, and identifying those portions of the

pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323.  Once the moving party has met its burden, Rule 56 requires the nonmoving

party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to

interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for

trial.  *Celotex*, 477 U.S. at 324.  "Where 'the adverse party does not respond, summary judgment, *if*

*appropriate*, shall be entered against the adverse party.' Fed. R. Civ. P. 56(e) (emphasis added). Thus,

summary judgment, even when unopposed, can only be entered when 'appropriate.'" *United States v.*

*One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir.

2004).

---

[2] Plaintiff includes an argument regarding her hostile work environment claim in her brief in response to the motion for summary judgement. (Doc. 66 at p.55ff).  However, that claim has already been dismissed. (Doc. 41 at ¶ 2).

The substantive law will identify which facts are material and which are irrelevant.  *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  When opposing a motion for summary judgment, however, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *See Lewis v. Casey*, 518 U.S. 343 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023.  "If the evidence [presented by the nonmoving party to rebut the moving party's evidence] is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249 (internal citations omitted).

## IV.   BACKGROUND AND FACTS

Plaintiff is a black female over the age of forty. (Doc. 32 at ¶ 5).  Plaintiff was hired by Defendant, which operates as a component of the Alabama State Department of Education ("ALSDE").[3] (Doc. 32 at ¶7). Plaintiff was employed as a disability specialist until August 15, 2012, when her employment was terminated. (Doc. 32 at ¶¶ 7, 14-16; Doc. 59-7 at 21). During her employment with Defendant, Plaintiff filed at least one other Equal Employment Opportunity Commission ("EEOC") charge—in 2006—alleging discrimination. (Doc. 34-2).

Plaintiff alleges that during her tenure with Defendant she performed her duties in an "exemplary and highly competent manner," and received—up until 2010— performance appraisal ratings of "Meets Standards," "Exceeds Standards," and on one occasion, "Consistently Exceeds Standards." (Doc. 32 at ¶¶ 8, 10-12). However, the record reveals evaluations at various stages of Plaintiff's tenure with

---

[3] Plaintiff's EEOC charge states she was hired in 1998 (Doc. 34-2), as does her first complaint (Doc. 1) and her affidavit (Doc. 22-1 at ¶ 2), and she claimed to have been hired in 1997 in her deposition. (Doc 58-20 at p.9). For the purposes of this motion for summary judgment, it is assumed that she was hired in or before 2000, as that is what is stated in the First Amended Complaint. (Doc. 32 at ¶ 7). The date of her hire is not a fact material to the disposition of the claims in this case, nor has it been considered in making any ruling.

Defendant that included instances of failing to meet standards or only partially meeting standards. (Doc. 58-15 at 26-27; Doc. 59-1 at1; Doc 59-1 at 22; Doc. 59-2 at 18; Doc. 59-3 at 10). The evidence indicates that although Plaintiff received an overall rating of "Meets Standards" and a "Performance Appraisal Score" of 20 (out of a possible 40) on her evaluation for 2009, she received a rating of "partially meets standards" in the responsibility category of "Developmental Quality." (Doc. 67-6). Plaintiff received an overall rating of "Partially Meets Standards" and a "Performance Appraisal Score" of 10 (out of a possible 40) on her evaluation for 2010, and received a rating of "does not meet standards" in the responsibility categories of "Developmental Quality" and "Control of Aged Claims," and "partially meets standards" in the responsibility category of "Productivity." (Doc. 67-5).

Plaintiff alleges that in 2011, Beth Jones, Tommy Warren, and Norman Ippolito became her direct supervisors, after which her subsequent appraisals continued to decline. (Doc. 59-7 at 4-13). Plaintiff complained about these appraisals, and contends that they were the product of race discrimination. (Doc. 32 at ¶¶ 9-12).

Plaintiff claims she was never promoted to the position of senior disability specialist, while white counterparts received promotions.  (Doc. 32 at ¶¶ 14, 24-26).  She identifies 13 white and/or male and/or younger employees who she contends were "routinely promoted," while she remained in her same position. (Doc. 32 at ¶¶ 16, 26; Doc. 67-13). Plaintiff alleges that under the supervision of Beth Jones, she was given a higher case load than comparator employees. (Doc. 32 at ¶ 13).  Plaintiff further states that she was "discriminated and retaliated against ... with respect to job duties, and assignments, job evaluations, pay, working conditions, hiring, promotion, hostile work environment, discipline, and other terms and conditions of employment."  (Doc. 32 at ¶ 18).

On July 20, 2012, Defendant sent Plaintiff a "Notice of Pre-Termination Action" which informed Plaintiff that that a recommendation to terminate her employment had been made and was based on her failure to perform her job duties and to comply with rules. (Doc. 59-7 at 2). Following a hearing on July 27, 2012, which Plaintiff did not attend (Doc. 66 at 20, ¶ 56), Defendant terminated Plaintiff's

employment effective August 15, 2012. (Doc. 59-7 at 21-22). After Plaintiff's 2012 termination, she

filed another EEOC charge. (Doc. 34-2). In this charge, dated November 6, 2012, she alleged as follows:

> I am Black. I was hired by the above named employer on or about September 10, 1998, as a disability specialist. On October 10, 2006, I filed a charge of employment discrimination after I was denied a not promotion [sic]. In December 2011, I was given a Performance Improvement Plan (PIP) and place[d] on probation for a period of at least six (6) months.  I was assigned to work for two White supervisors with a history of terminating Black employees. I was given a case load that exceeded the number of cases assigned to similarly situated white employees. My supervisors kept giving me mixed instructions on how I was expected to perform my job. I had 98.6% accuracy rate on the cases that I worked.  I was discharged on August 15, 2012, as a probationary employee.
>
> Norman Ippolito, Manager, told me I was being terminated due to my lack of production, which I deny.
>
> I believe I was discriminated against because of my race, Black and in retaliation for having filed a previous charge of discrimination in October 2006, in violation of Title VII of the Civil Rights Act of 1964, as amended. I have no knowledge of a similarly situated White employee who is still employed.

(Doc. 34-2).    The EEOC issued to Plaintiff a right-to-sue letter on September 20, 2013.  (Doc. 34-2).

Plaintiff initiated this lawsuit on December 20, 2013 by filing a *pro se* complaint. (Doc. 1). Attorney

Tyrone Townsend entered an appearance on her behalf on May 27, 2014. (Doc. 21). Pursuant to this

court's order, the First Amended Complaint was filed on December 22, 2014. (Doc. 32).

On September 30, 2015, the District Judge entered an Order granting in part Defendant's motion

to dismiss as to several claims. (Doc. 41). On October 11, 2016, Defendant filed a motion for summary

judgment as to all remaining claims. (Doc. 56). That motion has been fully briefed and argued.

## V.    DISCUSSION

### A.    Eleventh Amendment Immunity

Defendant first argues that it "is entitled to Eleventh Amendment immunity for plaintiff's racial

discrimination claims brought under 42 U.S.C. § 1981. The Office of Disability Determination Services

(DDS) is a component of the Alabama State Department of Education (ALSDE) which is a state agency.

*Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003)." (Doc. 57 at p.24). Although Plaintiff stated in her

First Amended Complaint that Defendant is a state agency (Doc. 32 at ¶ 2) and Defendant has represented to her that it is a state agency (Doc. 48 at ¶ 2), she contends in her brief in response to Defendant's motion for summary judgment that Defendant "is merely a leg or subsidiary of a state Agency and does not qualify under federal or state law as immune." (Doc. 66 at 41). The Defendant bears the burden of establishing that it is entitled to Eleventh Amendment Immunity from suit. *See Misener Marine Const., Inc. v. Georgia Ports Auth.*, 199 F. App'x 899, 900 (11th Cir. 2006)(per curiam)(affirming denial of defendant's motion to dismiss where it "failed to satisfy its burden of establishing Eleventh Amendment Immunity at this procedural juncture.").

> The Eleventh Amendment provides immunity by restricting federal courts' judicial power:

>> "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

> *U.S. Const. amend. XI.* The Eleventh Amendment protects a State from being sued in federal court without the State's consent.8 As a result, parties with claims against a non-consenting State must resort to the State's own courts. The Eleventh Amendment is "a recognition that states, though part of a union, retain attributes of sovereignty, including immunity from being compelled to appear in the courts of another sovereign against their will." *McClendon v. Georgia Dep't of Cmty. Health*, 261 F.3d 1252, 1256 (11th Cir. 2001).

> It is also well-settled that Eleventh Amendment immunity bars suits brought in federal court when the State itself is sued and when an "arm of the State" is sued. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed. 2d 471 (1977). To receive Eleventh Amendment immunity, a defendant need not be labeled a "state officer" or "state official," but instead need only be acting as an "arm of the State," which includes agents and instrumentalities of the State. *See Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429–30, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997). Whether a defendant is an "arm of the State" must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise. *See Shands Teaching Hosp. & Clinics v. Beech St. Corp.*, 208 F.3d 1308, 1311 (11th Cir. 2000) ("The pertinent inquiry is not into the nature of [an entity's] status in the abstract, but its function or role in a particular context.").

*Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003).

7

The issue at bar — whether the entity sued is an arm of the state — "must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise." *Id*. To determine whether a defendant, while engaged in the relevant function, acts as an arm of the state, the Eleventh Circuit has set out a four-factor inquiry, taking into account:  (1) how state law defines the entity; (2) what degree of control the state maintains over the entity; (3) the source of the entity's funds; and (4) who bears financial responsibility for judgments entered against the entity. *See Manders*, 338 F.3d at 1309.

### 1.  How State Law Defines the Entity

The first factor in the Eleventh Amendment analysis is how Alabama law defines the Defendant. The Social Security Act as codified at 42 U.S.C. § 421(a)(1) – (2) specifically provides that disability determinations "shall be made by a State agency…" Under Alabama law, Defendant DDS serves as a State agency as contemplated by the Social Security Act as a component of the ALSDE as authorized under the broad organizational enabling statute for the ALSDE. *See* § 16-2-3, Ala. Code 1975 ("By action of the State Board of Education, upon recommendation of the State Superintendent of Education, the department shall be organized into such divisions and services as may be found necessary to carry on its work efficiently."). Moreover, since June 1980, Alabama law has specifically provided that employees of the Defendant "shall be covered under the state Merit System … in the classified service of the state…" and that "all the benefits of the State Merit System shall be extended to such employees." §36-26-65, Ala. Code 1975.

"Although the specific duties the State assigns to [an entity] shed considerable light on the character of the [entity]," the court's analysis "must focus on the nature of the particular function at issue," which in this case is not, as Plaintiff argues, the administration of Federal disability benefits (Doc. 66 at 44), but whether the employment decisions and conditions created and implemented by the Defendant resulted in racial discrimination against Plaintiff. *Manders*, 338 F.3d at 1319. In this case, regardless of the tasks the Defendant undertakes in determining whether applicants will be entitled to

Federal disability benefits, the Defendant clearly acts as a State agency when it creates and implements its organizational structure, makes employment decisions, and evaluates its Merit System employees. Neither the Federal government nor any other State or private entity makes employment decisions for Defendant DDS; rather, the Defendant makes all decisions regarding the organizational structure, employment, and quality assurance of those employees without regard to Federal control, specifically because those actions are delegated to the Defendant as a State agency pursuant to 20 C.F.R. § 404.1620, which provides in pertinent part:

> (a) The State will provide the organizational structure, qualified personnel, medical consultant services, and a quality assurance function sufficient to ensure that disability determinations are made accurately and promptly. We may impose specific administrative requirements in these areas and in those under "Administrative Responsibilities and Requirements" in order to establish uniform, national administrative practices or to correct the areas of deficiencies which may later cause the State to be substantially failing to comply with our regulations or other written guidelines...

> (b) The State is responsible for making accurate and prompt disability determinations.

> (c) Each State agency will designate experienced disability examiners to handle claims we refer to it under § 404.1619(a).

## 2.  Degree of Control the State Maintains Over the Entity

"The second factor of the Eleventh Amendment analysis examines where [State] law vests control." *Manders*, 338 F.3d at 1320. In conducting this analysis, "[t]he pertinent inquiry is not into the nature of [an entity's] status in the abstract, but its function or role in a particular context." *Shands Teaching Hosp. & Clinics*, 208 F.3d at 1311. *See Manders*, 338 F.3d at 1319 ("Based on our review of Georgia law, we conclude that the sheriff wears a "state hat" when he creates and implements force policy in the jail.[] Thus, this first factor weighs heavily in favor of immunity."). As noted above, in this case the Defendant is directly responsible for the organizational structure, selecting qualified personnel, and performing quality assurance functions in compliance with Federal regulations for the purpose of uniformity with other State entities performing under the same statutes.  The record indicates that Plaintiff's responsibilities and the evaluation criteria of her performance were determined by DDS.

9

(Doc. 67-3, 68-4). Each of Plaintiff's annual "Employee Performance Appraisal[s]" was conducted on State of Alabama Personnel Department "Form 13" which designated Plaintiff as "Classification: Disability Specialist" in "Agency: 008/Education." (Doc. 67-6). In a letter written by Plaintiff to DDS Director Norman Ippolito, Plaintiff stated that "Because of my tenure with the State of Alabama, I accumulate the maximum amount of annual and sick leave." (Doc. 67-12 at 2). Plaintiff further wrote that "A review of the agency's personnel file will show an excessive number of terminations and resignations from DDS. Which is a grave injustice and extensive waste of tax payers monies for the State of Alabama." Doc. 67-12 at 6). Plaintiff received her Notice of Termination on ALSDE letterhead, signed by then State Superintendent of Education Tommy Bice, "pursuant to Rule 670-X-18-.02 of the Alabama State Personnel Board Rules and Regulations." (Doc. 59-7 at 21-22). Accordingly, the evidence in the record is clear that the ALSDE exercised direct and substantial control over the employment, evaluation, and termination DDS employees, and "this control factor also weighs heavily in favor of [Defendant's] entitlement to Eleventh Amendment immunity." *Manders*, 338 F.3d at 1322.

### 3. Funds

"The third factor in the Eleventh Amendment analysis is where the entity derives its funds." *Manders*, 338 F.3d at 1323. Plaintiff argues that the Defendant "is funded by the Federal Government and administers it[s] duties on behalf of the Federal Government, under Federal Law." (Doc. 66 at 44). Federal regulations are clear that the funds for State entities like the DDS derive exclusively from the Treasury of the United State:

> (a) We will give the State funds, in advance or by way of reimbursement, for necessary costs in making disability determinations under these regulations. …
>
> …
>
> (d) The State may not incur or make expenditures for items of cost not approved by us or in excess of the amount we make available to the State.
>
> …

(f) Any monies paid to the State which are used for purposes not within the scope of these regulations will be paid back to the Treasury of the United States.

20 C.F.R. § 404.1626.  It is clear that although funds are received and administered by the State of Alabama, Federal regulations restrict funding of DDS exclusively to Federal funds.

### 4.  Liability for and Payment of Adverse Judgments

The fourth factor considers the source of the funds that will pay any adverse judgment against Defendant. This factor creates a double-bind for Plaintiff. Plaintiff argues that DDS is not a State agency. (Doc. 66 at p.44). However, if DDS is not a State agency, then neither the State of Alabama nor the Federal Government would be under an obligation to satisfy a judgment against DDS. Specifically, although the third *Manders* factor would seem to tilt against Eleventh Amendment immunity because of the express Federal regulations mandating and limiting the funding of DDS to those amounts budgeted, approved, and provided by the Treasury of the United States for the costs of making determinations, those very regulations make it clear that no other funds would be available to satisfy any judgment against DDS, whether from Treasury of the United States, the State of Alabama, or any private entity.

In other words, if the court finds that DDS is in fact a State entity, such that the State of Alabama could be called upon to satisfy a judgment against DDS, then Eleventh Amendment immunity clearly applies to prevent precisely that. If, on the other hand, the court were to find that DDS was not a State entity for purposes of Eleventh Amendment immunity solely because DDS receives its funding exclusively from the Treasury of the United States for approved, budgeted expenditures, DDS would literally be prevented by 20 C.F.R. § 404.1626(a) from satisfying a judgment because such judgments are not contemplated as "necessary costs in making disability determinations under these regulations."

Plaintiff argues that pursuant to the Supreme Court's holding in *Hess v. Port Authority Trans–Hudson Corp.*, 513 U.S. 30, 35–39, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994), "DDS is merely a leg or

subsidiary of a state Agency and does not qualify under federal or state law as immune." (Doc. 66 at

p.41). The Eleventh Circuit analyzed the import of *Hess* in the *Manders* decision:

> In *Hess*…, the Supreme Court denied Eleventh Amendment immunity to an interstate railway-port authority, created under the U.S. Constitution's Interstate Compact Clause and controlled by the federal government and two states. Because the federal government was one of the "multiple creator-controllers," the five-justice majority in *Hess* concluded that the states had ceded a portion of their sovereignty to Congress and that having the "Compact Clause" entity respond in federal court did not affront "the dignity" of the states. *Id*. at 47, 115 S.Ct. 394. *Hess* further concluded that "both legally and practically" neither state was obligated to pay any judgment against the entity. *Id*. at 51–52, 115 S.Ct. 394. Rather, the entity was financially independent, with funds from private investors, tolls, fees, and investment income. *Id*. at 36, 49–50, 115 S.Ct. 394. Although weighing this source-of-payment factor heavily, *Hess* never suggests that for Eleventh Amendment immunity a state treasury drain is required per se and *Hess* notes that "current Eleventh Amendment jurisprudence emphasizes the integrity retained by each State in our federal system." *Hess*, 513 U.S. at 39, 115 S.Ct. 394.

*Manders*, 338 F.3d at 1324–25 (footnote omitted). *Hess* is clearly distinguishable from this case. There

is no argument that Defendant DDS is a "Compact Clause" entity nor is there any evidence in the record

that DDS, as an entity, implicates any other sister State.  Moreover, unlike the interstate railway-port

authority in *Hess*, there is no evidence that Defendant DDS is "financially independent, with funds from

private investors, tolls, fees, and investment income." *Id*. at 1325. Quite the contrary, Defendant has no

other source of funds than those mandated for the costs of making determinations.

Further, as *Manders* held, "*Hess* never suggests that for Eleventh Amendment immunity a state

treasury drain is required per se and *Hess* notes that 'current Eleventh Amendment jurisprudence

emphasizes the integrity retained by each State in our federal system.' *Hess*, 513 U.S. at 39, 115 S.Ct.

394." *Manders*, 338 F.3d at 1325. Similarly in this case, although the Defendant's source of funding is

exclusively Federal and the funds to pay for a judgment are nil, a judgment against DDS would

ultimately implicate the integrity of the State of Alabama, and "[t]he State's 'integrity' is not limited to

who foots the bill…" *Id*. at 1328.

The first two factors weigh heavily in favor of immunity. The third and fourth factors create a

double-bind and an empty pocket from which Plaintiff cannot seek judgment without unavoidably

interfering with a state program or function. Accordingly, Defendant is entitled to Eleventh Amendment immunity for Plaintiff's racial discrimination claims brought under 42 U.S.C. § 1981, and Defendant's motion for summary judgment is due to be granted as to those claims.

### B.    Race Discrimination Claims

Plaintiff's remaining Title VII claims are not subject to Eleventh Amendment Immunity and are as follows: race-based disparate treatment in termination, job duties, assignments, job evaluations, promotion, and discipline. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*., makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "A plaintiff may establish a claim of illegal disparate treatment through either direct evidence or circumstantial evidence. *See Schoenfeld v. Babbitt,* 168 F.3d 1257, 1266 (11th Cir.1999)." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1085 (11th Cir. 2004).

Direct evidence is generally defined as evidence which, if believed, proves the existence of a fact in issue without the need of an inference or presumption. *See, e.g.*, *Bass v. Board of County Commissioners*, 256 F.3d 1095, 1111 (11th Cir. 2001), *overruling on other grounds recognized by Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008) (holding that the term "direct evidence," when used in the context of Title VII race discrimination claim, "refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination"); *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) ("Direct evidence, by definition, is evidence that does not require ... an inferential leap between fact and conclusion."); *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997) (defining direct evidence of discrimination as evidence which, "if believed, proves [the] existence of [a] fact in issue without inference or presumption"); *Merritt v. Dillard Paper Co.*, 120 F.2d 1181, 1189 (11th Cir. 1997) (same); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (same); *Rollins v. TechSouth,*

*Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987) (same); *Lee v. Russell County Board of Education*, 684 F.2d 769, 774 (11th Cir. 1982) ("Where the evidence for a *prima facie* case consists ... of direct testimony that defendants acted with a discriminatory motivation, if the trier of fact believes the *prima facie* evidence the ultimate issue of discrimination is proved; no inference is required."). *See generally Black's Law Dictionary* 577 (7th ed. 1999) (defining "direct evidence" as "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption.").

In the context of employment discrimination cases, direct evidence of an employer's intent to discriminate on the basis of some prohibited characteristic — in this case Plaintiff's race — is more specifically defined as "evidence which reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'" *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (quoting *Carter*, 132 F.3d at 641 (in turn quoting *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990)). As such, "direct evidence of discrimination is powerful evidence capable of making out a *prima facie* case essentially by itself." *Jones v. Bessemer Carraway Medical Center*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998) (*per curiam*). "In the face of direct evidence, an employer must prove that the same employment decision would have been made absent any discriminatory intent." *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989).

In the absence of direct evidence, the evaluation of disparate treatment claims turns to circumstantial evidence.

> In evaluating disparate treatment claims supported by circumstantial evidence, we use the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under this framework, the plaintiff first has the burden of establishing a *prima facie* case of discrimination, which creates a rebuttable presumption that the employer acted illegally. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir. 1997). A plaintiff establishes a *prima facie* case of disparate treatment by showing that she was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class. *See, e.g.,*

*McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

*Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).

### 1. Termination

Plaintiff argues that this case involves direct evidence of discrimination in the termination of her employment. (Doc. 66 at p.54). Her argument that the termination of her employment involves direct evidence is as follows, in its entirety:

> Direct evidence of the discrimination against McCurdy is her Pre-termination letter from Dr. Bice which falsely claims McCurdy received discipline (Doc. 58-15 pp 24-25 ¶ III). These are undisputed examples of direct evidence of discrimination making summary judgement improper as a matter of law.

> "Direct evidence is evidence, which if believed, proves the existence of the fact in issue without inference or presumption. If a plaintiff offers direct evidence and the trier of fact accepts that evidence, then the plaintiff has proven discrimination." [Jenkins v. Tuscaloosa City Bd. of Educ., 72 F. Supp. 3d 1238, 1244 (N.D. Ala. 2014)].

(Doc. 66 at 54).

Plaintiff argues that the pre-termination letter sent by Superintendent Bice "falsely claims [Plaintiff] received discipline (Doc. 58-15 pp 24-25 ¶ III)" and that this reflects an "undisputed" example of direct evidence of discrimination. (Doc. 66 at 54). This assertion misapprehends the nature of direct evidence—mistakes, misjudgments and inaccurate information may reflect poor management, but they do not directly show discrimination. The pre-termination letter in question reflects that the recommendation to terminate Plaintiff's employment was based on her failure to perform her job duties and to comply with rules. (Doc. 59-7 at 2). The letter refers to a number documents in the record as evidence of Plaintiff's "past disciplinary history." *Id*. However, whether those documents reflect performance appraisals or "discipline" is irrelevant to the fact that neither the pre-termination letter nor any part of the "disciplinary history" referenced in the letter contain any evidence that would permit a court to find discrimination without an inferential leap or presumption. Even construing the evidence in the light most favorable to the Plaintiff, Plaintiff's argument that the disciplinary history was "false" is,

in and of itself, an inferential leap and a presumption which negates her argument that the record reflects direct evidence of discrimination. Because Plaintiff has not presented direct evidence of discrimination, the evaluation turns to circumstantial evidence.

Defendants argue that Lamar cannot meet her *prima facie* requirements for her Title VII disparate treatment claim as to termination. The parties do not dispute that Plaintiff was a qualified member of a protected class and was subjected to an adverse employment action. However, Plaintiff fails to direct the court to any evidence that she "was replaced by a person outside h[er] protected class or was treated less favorably than a similarly-situated individual outside h[er] protected class. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Maynard v. Bd. of Regents of Div. of Universities of Florida Dep't of Educ. ex rel. Univ. of S. Florida*, 342 F.3d 1281, 1289 (11th Cir. 2003). Moreover, in her deposition, when asked "Can you tell me one person that's graded differently that's a disability specialist while you were working there?" Plaintiff responded that "I cannot testify to that." (Doc. 58-8 at p.4).  The Eleventh Circuit has stated:

> As part of the Title VII plaintiff's prima facie case, the plaintiff must show that his employer treated similarly situated employees outside his classification more favorably than herself. *Coutu v. Martin Cty. Bd. of Cty. Commissioners*, 47 F.3d 1068, 1073 (11th Cir. 1995). To make a comparison of the plaintiff's treatment to that of non-minority employees, the plaintiff must show that he and the employees are similarly situated in all relevant respects. *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 17 (1st Cir. 1994); *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992); *Smith v. Monsanto Chemical Co.*, 770 F.2d 719, 723 (8th Cir. 1985), *cert. denied*, 475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986). In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways. Williams v. Ford Motor Co., 14 F.3d 1305, 1309 (8th Cir.1994). *If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present. See, e.g., Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 182 (1st Cir.1989).

*Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)(emphasis in original).

In this case, Plaintiff has failed to demonstrate the existence of a similarly situated employee who was treated more favorably or that she was replaced by a person outside her protected class.

Accordingly, Plaintiff has failed to satisfy the prima facie requirement as to termination, and Defendant's motion for summary judgment on this issue is due to be granted.

### 2.  Promotion

Plaintiff alleges that Defendant discriminated against her with regard to promotions.  (Doc. 32 at ¶ 18).  Plaintiff alleges that she is African-American and that despite her "exemplary," "highly competent," and "often superior" performance, similarly situated white disability specialists were promoted in her stead.  (Doc. 32 at ¶8, 14, 16). She names thirteen white comparators whom she contends were promoted during her tenure with Defendant (Doc. 32 at ¶16) and another white comparator, Sheila Guthrie, during her deposition (Doc. 58-21 at 5).  As to Plaintiff's claim of Title VII discrimination for failure to promote, Plaintiff argues that

> There is no evidence in the record to support the claims of the Defendant that  the selectees possessed any more experience, education, or  performed any better than McCurdy, to the contrary the record clearly shows McCurdy was equally or even more qualified in several of the groups promoted yet she was not selected.
> This is direct evidence of discrimination.

(Doc. 66 at 48-49). However, the bare allegation that other selectees were promoted instead of Plaintiff would still require an inferential leap or presumption in order for a court to find that such a selection was clearly the result of discrimination.

Because Plaintiff has not presented direct evidence of discrimination, the evaluation turns to circumstantial evidence.

> Under the McDonnell Douglas framework, to prevail on a claim of failure to promote, a plaintiff may establish a prima facie case of sex discrimination by showing that: (1) she is a member of a protected class; (2) she was qualified and applied for the promotion; (3) she was rejected despite her qualifications; and (4) other equally or less qualified employees who were not members of the protected class were promoted. *See Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir.2000).

*Wilson*, 376 F.3d at 1089.  Defendant argues that Plaintiff "fails to make a prima facie case of failure to promote because she was not qualified for the promotion and the white comparators did meet the qualifications." (Doc. 57 at 52).

Of the comparators listed by Plaintiff, only three were promoted during the period when Plaintiff was on the State of Alabama Certificate of Candidates for the position of Senior Disability Specialist. (Doc. 67-13). Plaintiff appears on certificates dated November 3, 2004, through January 23, 2007. *Id.* at 4-14.   During that same period, three candidates were hired for the position of Senior Disability Specialist: Sheila Guthrie on November 12, 2005; Susan Beth Jones on February 18, 2006, and Harold McKee on June 16, 2006, each of whom are white and reflect a lower grade than Plaintiff on the respective certificates. (Doc. 58-17 at 2; Doc. 67-13 at 9, 10, and 12). Although the certificates list candidates and rank them either by a numerical grade or by grade "bands," the certificates only designate the names as "candidates" and do not address the qualifications for the position of Senior Disability Specialist or whether each candidate possesses any or all of those qualifications. Moreover, there is no information on the certificates themselves or elsewhere in the record regarding the factors used to determine candidate rankings and whether those rankings correspond in any material way to the specific qualifications for Senior Disability Specialist.

Defendants argue that pursuant to the testimony of former DDS District Supervisor Norman Ippolito,

> In order to be eligible to be promoted from a disability specialist to a senior disability specialist, a disability specialist had to have: (1) 6 years of service as a disability specialist; (2) had to apply for the position through the State of Alabama Department of Personnel; (3) had to have his or her name on a certification of candidates register (eligibles) from the State Personnel Board; (4) be meeting or exceeding standards in each responsibility; and (5) the applicant must receive a recommendation from their unit supervisor.

(Doc. 58-15 at ¶ 42).  Ippolito further testified that at the time of each of the promotions in question, each of the candidates who were promoted were meeting standards and were recommended for promotion by their supervisors, but that Plaintiff was "partially meeting standards in developmental quality" and that she "never received a recommendation from her supervisor that she be promoted to the position of senior disability specialist." (Doc. 58-15 at ¶¶ 33-37). In a letter written by Plaintiff to DDS Director Tommy Warren on June 17, 2005, Plaintiff acknowledged that she was "confused by the 'poor

quality of service' assessment made" regarding one of her cases. (Doc. 67-2 at 1). Plaintiff further acknowledged that her supervisor "does not **feel comfortable** in recommending me for a senior disability specialist position…" and that "[t]his is the second time [the supervisor] did not recommend me for a senior disability specialist position…" (Doc. 67-2 at 2)(emphasis in original).

Although the qualifications as for the position enumerated by Ippolito would clearly disqualify Plaintiff, viewing the evidence in the light most favorable to Plaintiff, the certificates and rankings on them would, if believed, create at least a prima facie case that Plaintiff was qualified for the position, that she was not promoted, and that qualified employees who were not members of the protected class were promoted. Accordingly, Plaintiff has met her prima facie burden.

> When the plaintiff establishes a prima facie case, which creates the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *See Rojas*, 285 F.3d at 1342; *Combs*, 106 F.3d at 1528. The employer "need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254-55, 101 S.Ct. at 1094. If the employer satisfies its burden by articulating one or more reasons, then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination. *Id*. at 255-26, 101 S.Ct. at 1094-95.

> If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. *See Chapman*, 229 F.3d at 1030. Quarreling with that reason is not sufficient. *See id*. The evidence of pretext may include, however, the same evidence offered initially to establish the prima facie case. *See Combs*, 106 F.3d at 1528.

*Wilson*, 376 F.3d at 1087–88. In this case, Defendant has clearly articulated that the reason other candidates were promoted instead of Plaintiff is that she was "partially meeting standards" on her evaluations (Doc. 58-15 at ¶ 34-36) and that her supervisors did not recommend her for promotion, a fact which Plaintiff acknowledged. (Doc. 58-15 at ¶37; Doc. 67-2 at 2). Accordingly, the burden of production shifts to Plaintiff to prove that the articulated reasons are a pretext for discrimination.

> "[A plaintiff] cannot prove pretext by asserting baldly that she was better qualified than the person who received the position at issue. *See Alexander*, 207 F.3d at 1339. Wilson must instead adduce evidence that the disparity in qualifications was "so apparent as virtually to jump off the page and slap you in the face." *Cofield v. Goldkist, Inc.*, 267 F.3d 1264, 1268 (11th Cir.2001) (citing *Denney*, 247 F.3d at 1187 (11th Cir.2001))

(quoting *Lee*, 226 F.3d at 1253-54); accord *Alexander*, 207 F.3d at 1339-40 (all quoting *Deines v. Texas Dep't of Protective & Reg. Servs.*, 164 F.3d 277, 280 (5th Cir.1999)).

*Wilson*, 376 F.3d at 1090.

Although Plaintiff argues that meeting standards and a supervisory recommendation were not actually qualifications for promotion (Doc. 66 at p.53-54), she offers no argument or evidence that the articulated nondiscriminatory reasons offered by Defendant were pretextual. Accordingly, Plaintiff has not met her burden of production as to the issue of promotion, and Defendant's motion for summary judgment as to this issue is due to be granted.

### 3.   Job Duties and Assignments

Plaintiff alleges that Defendant discriminated against her with respect to job duties and assignments. (Doc. 32 at ¶ 18). Plaintiff does not distinguish between the "assignments" she received and the "duties" she was required to perform that were the result of race discrimination. However, Plaintiff alleges in her EEOC charge that she was assigned to work for "two White supervisors with a history of terminating Black employees" and that she was given a case load that "exceeded the number of cases assigned to similarly situated white employees." (Doc. 34-2). She alleges in her complaint that because of her race, she was assigned a higher case load than her comparator employees. (Doc. 32 at ¶ 13).

Defendant argues that Plaintiff "fails to show that similarly situated employees outside of her protected class were treated more favorably." (Doc. 57 at 2). Specifically, Defendant notes that at her deposition, Plaintiff admitted that she did not know of any similarly situated disability specialists that received fewer case assignments. (Doc. 58-2 at 6). Plaintiff admitted that she had no basis for believing that cases were assigned other than by an automated case distribution system. (Doc. 58-3 at 7). Plaintiff further admitted that Beth Jones did not assign her more cases than other similarly situated employees. (Doc. 58-3 at 136-37). Plaintiff has offered no response to Defendant's argument on this issue. Although Plaintiff fails to address this issue, the court has still considered this matter on the merits of the motion.

*See United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004)("[S]ummary judgment, even when unopposed, can only be entered when 'appropriate.'").

> Title VII is not designed to make federal courts "'sit as a super-personnel department that reexamines an entity's business decisions.'" *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991); *see also Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997) (stressing that "federal courts do not sit to second-guess the business judgment of employers"). Work assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities. The same concern exists for public entities such as the Town's Police Department, which must balance limited personnel resources with the wide variety of critically important and challenging tasks expected of them by the public.

*Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1244 (11th Cir. 2001).

> In order to set forth a claim of racial discrimination, a plaintiff must show that [s]he has suffered an adverse employment action; that is, [s]he must establish that [s]he has suffered a "materially adverse" change in the terms or conditions of employment because of the employer's actions. *See Kocsis v. Multi–Care Management, Inc.*, 97 F.3d 876, 885 (6th Cir.1996) (citation omitted).

*Allen v. Michigan Dep't of Corr.*, 165 F.3d 405, 410 (6th Cir. 1999) In this case, Plaintiff fails to offer any evidence that she suffered an adverse employment action to support her claim of discrimination in job duties and assignments or that any similarly situated employee was treated more favorably. Accordingly, Plaintiff has failed to demonstrate a prima facie case of discrimination as to job duties and assignments, and Defendant's motion for summary judgment is due to be granted on this issue.

### 4.  Job Evaluations

Plaintiff alleges that Defendant discriminated against her with respect to job evaluations. (Doc. 32 at ¶ 18). Negative performance reviews or evaluations, without more, are not actionable under the discrimination clause of Title VII.  In *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232 (11th Cir. 2001), the Eleventh Circuit stated that a "Title VII discrimination claim … rarely may be predicated merely on employer's allegedly unfounded criticism of an employee's job performance, where that criticism has

no tangible impact on the terms, conditions, or privileges of employment." *Id*. at 1242. The court further stated:

> Employer criticism, like employer praise, is an ordinary and appropriate feature of the workplace. Expanding the scope of Title VII to permit discrimination lawsuits predicated only on unwelcome day-to-day critiques and assertedly unjustified negative evaluations would threaten the flow of communication between employees and supervisors and limit and employer's ability to maintain and improve job performance. […] Simply put, the loss of prestige or self-esteem felt by an employee who receives what he believes to be unwarranted job criticism or performance review will rarely---without more---establish the adverse employment action necessary to pursue a claim under Title VII's anti-discrimination clause.

*Id*. at 1242. The court then drew a distinction between performance reviews that result in employees being injured in the "tangible terms;" i.e., with regard to the "terms, conditions, or privileges" of employment, and those which do not impact the employee in a material way. *Id*. at 1245-1246.

Plaintiff alleges that after being assigned to work under certain supervisors whom she alleges had a history of terminating African-Americans, she received negative performance reviews. (Doc. 32 at ¶ 9). She claims that these negative performance reviews were without a legitimate basis and were made on the basis of her race. (Doc. 32 at ¶ 11). She alleges that she was eventually terminated based on the performance reviews, with her employer attributing her termination to her failing to meet the standards of the job. (Doc. 32 at ¶ 12). Termination is a "tangible" injury which impacted Plaintiff in a material way.

Defendant argues that Plaintiff fails to support this claim with probative evidence. (Doc. 57 at 54). Plaintiff does not directly address the discrete claim of discrimination in the form of job evaluations except in the context of her arguments in support of her claims of discrimination in termination and promotions. (Doc. 66 at 50-54). However, "[t]o make out a prima facie case of racial discrimination a plaintiff must show (1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to adverse employment action; and (4) her employer treated similarly situated employees outside her class more favorably." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). At no point in her argument does Plaintiff identify any similarly situated employee outside her class that was treated

more favorably as to job evaluations nor has Plaintiff provided such evidence in the record. Moreover, the only adverse employment action claimed by Plaintiff in regard to the allegedly discriminatory job evaluations was the termination of her employment for which, as stated above, summary judgment is due in Defendant's favor on that issue. Accordingly, Plaintiff fails to establish a prima facie case of discrimination in job evaluations, and summary judgment is due in favor of Defendant.

### 5.   Discipline

Although Plaintiff's First Amended Complaint alleged discriminatory and "unjustified discipline," (Doc. 32 at ¶¶17-18), Plaintiff now asserts that "Plaintiff McCurdy has never been disciplined in her career with DDS. Any assertion by the Defendant's otherwise is pure pretext…" (Doc. 66 at 62). Plaintiff appears to be arguing again that the "disciplinary history" relied upon in the pre-termination letter she received was "completely fabricated," "false and contrived after the fact." (Doc. 66 at 63). To the extent that Plaintiff denies that she was ever disciplined, this argument eliminates her claim of disparate treatment discrimination as to discipline. *See Id.* ("Counseling's and appraisal ratings are not discipline under the rules."). Moreover, to the extent that Plaintiff is arguing that she was only subject to "false" or "contrived" evaluations later characterized as "discipline," that argument has already been addressed separately under Plaintiff's claim of disparate treatment in her job evaluations *supra*. Accordingly, Defendant's motion for summary judgment as to Plaintiff's claim of disparate treatment as to discipline is due to be granted.

### VI.   CONCLUSION AND ORDER

For the reasons stated, it is **ORDERED:**

Defendant's motion for summary judgment (Doc. 56) is **GRANTED.**

**DONE** and **ORDERED** this 17th day of March 2017.

David A. Baker
United States Magistrate Judge

23